CELIA McGUINNESS, ESQ. (SBN 159420)
DERBY, McGUINNESS & GOLDSMITH, LLP
1999 Harrison Street, Suite 1800
Oakland, CA 94612
Telephone: (510) 987-8778
Facsimile: (510) 359-4414
cmcguinness@dmglawfirm.com
eservice@dmglawfirm.com

STEVEN L. DERBY, Esq. (SBN 148372)
DERBY, McGUINNESS & GOLDSMITH, LLP
501 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (510) 987-8778
Facsimile: (510) 359-4419
eservice@dmglawfirm.com
sderby@dmglawfirm.com

Attorneys for Plaintiffs
EDWIN LINWOOD and TAMMY DAVIS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMMY DAVIS AND EDWIN LINWOOD,<br><br>  Plaintiffs,<br><br>  v.<br><br>AIDS HEALTHCARE FOUNDATION,<br><br>  Defendant. | CASE NO.<br><br><u>Civil Rights</u><br><br>**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES:**<br><br>1.  Violation of the Federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*<br><br>2.  Violation of the Fair Employment and Housing Act, Cal. Gov't Code 12926 *et seq.*<br><br>3.  Violation of the Unruh Civil Rights Act, Cal. Civil Code § 51 *et seq.*<br><br>4.  Violation of the Civil Code § 54 *et seq.*<br><br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

**SUMMARY OF PARTIES AND CLAIMS**

1.      Plaintiffs TAMMY DAVIS and EDWIN LINWOOD (sometimes collectively referred to as "Plaintiffs") bring this action seeking injunctive relief requiring nonprofit Defendant AIDS HEALTHCARE FOUNDATION ("AHF" or "Defendant"), to provide equal accommodations and services to Plaintiffs, who are AHF's disabled tenants in a Single Room Occupancy (SRO) hotel in Los Angeles, California.  Despite Plaintiffs' repeated requests <u>over six years</u>, Defendant refuses to maintain and repair the elevator to keep it in working order. Mr. Linwood resides on the third floor. Ms. Davis lived on the second floor until recently, but was transferred to the first floor after her neighbor's butane stove exploded, significantly damaging her unit. Although Ms. Davis lives on the first floor, there are no working showers on the first floor, so she must continue to use the community bathing facilities on the second floor.

2.      Despite 15 Orders to Comply issued by the City of Los Angeles for failure to provide a working elevator, a previous disability discrimination lawsuit based on a lack of working elevator, a pending class action lawsuit which includes a claim of reduction of housing services due to the lack of a working elevator, a pending state disability discrimination lawsuit brought by a different Madison tenant based on a lack of working elevator, another lawsuit brought by a former Madison resident concerning his injury caused by the dangerous elevator, and front page Los Angeles Times articles and other media coverage concerning the lack of a working elevator,  , Defendant refuses to modernize this elevator which is now over 100 years-old and is out of service more than it is in service.

**<u>GENERAL ALLEGATIONS</u>**

3.      On September 27, 2017, AHF purchased the Madison Hotel located at 423 East 7th Street in the City of Los Angeles. The Madison is an SRO wherein almost all of the residents must share community bathing and restroom facilities. There are no community bathing facilities on the first floor. The Madison has one elevator serving every floor of the six-story building. For a tenant who cannot climb stairs due to a disability, including the Plaintiffs, the elevator is the only means for them to access their home or to leave the Madison without experiencing significant pain or, in some instances risking life and limb.

4.      City of Los Angeles Elevator Code Section 92.109 states:

Every inhabited building provided with a passenger elevator shall maintain at least one operational passenger elevator serving all occupied levels of the building regardless of the number of stories.

5.      For years now, Plaintiffs have repeatedly asked and even begged AHF's executives, regional directors of property management, onsite managers, and front desk workers to fix the elevator. The response was always the same, "we are working on it." But AHF is not working on it. Plaintiffs have also asked AHF to install a stair chair lift- to be installed from the first to second floor, so that tenants with disabilities can suffer less when the elevator is out of service.  That request was denied.

6.      From June 11, 2018, until March 31, 2019, AHF hired a company called Statewide Enterprises (STATEWIDE) to "professionally manage" the Madison. STATEWIDE mishandled elevator maintenance and in fact informed AHF about the fact that the building did not have a working elevator – not because of the hardship on the tenants but because STATEWIDE'S President Mark Chopp did not want to be sued.

7.      After a meeting with AHF President Michael Weinstein where Mr. Weinstein assured Mr. Chopp that AHF would fully indemnify STATEWIDE for any lawsuit and agreed to raise STATEWIDE'S management fee, STATEWIDE agreed to continue as manager while the elevator was out of service.

8.      AHF and STATEWIDE were repeatedly told by competent elevator professionals that the hundred-year-old elevator needed to be substantially modernized, if not completely replaced. Nothing was done and so the elevator stayed out of service, working occasionally but mostly not. This has been going on since 2017. In the last six years, the elevator has spent more time out of service than in service.   AHF has various elevator companies come out and get the elevator working but it soon breaks down again – many times the same day it is "fixed."

9.      The elevator at The Madison falls under the jurisdiction of the Los Angeles Dept. of Building and Safety (LADBS). When AHF bought The Madison, LADBS had already "red tagged" the elevator for numerous violations of Elevator Safety Orders and failure of prior ownership to comply with previous Orders to Comply. The Madison was also under a settlement

agreement which required, among other things, that the elevator be maintained operational pursuant to a settlement agreement between Madison tenants and the prior owner. On October 5, 2017, the Legal Aid Foundation of Los Angeles sent a letter advising AHF of the settlement's requirements.

10.     AHF hired an elevator service company called Continental Elevator on September 28, 2017. The contract did not provide for a comprehensive program of preventative maintenance as required by numerous statutes and regulations, and essentially was what is known in the industry as an "oil and grease" contract. In the 8 months between January 1, 2018, and August 27, 2018 (when AHF fired Continental) Continental was called out to fix the elevator at least 31 times.

11.     On May 9, 2018, Continental sent a proposal to "refurbish" the elevator "to meet ADA requirements" at an estimated cost of $165,000. This proposal was passed "up the chain" at AHF to its second-in-command, Mark Dyer, Senior Director of Asset Management. AHF never accepted nor responded to Continental's proposal.

12.     On August 8, 2018, AHF received a letter from the tenants' rights nonprofit, LA Community Action Network, inviting AHF management to discuss the elevator "breaking down and not being repaired in a timely manner." AHF ignored the invitation. Two days later a tenant named Kenneth Owens fell down an open elevator shaft on August 10, 2018. (Video available at https://www.youtube.com/watch?v=6WckITEz94M at timestamp 0:51.)  Shortly thereafter, Mr. Dyer ordered the elevator sealed. AHF fired Continental and hired Amtech Elevator, a subsidiary of Otis Elevator Company, in August of 2018.

13.     On August 13, 2018, AHF's Director of Maintenance, Juan Larios, sent an email to Amtech stating, "this building has an old elevator that we would like to replace." From then on, communications between Mr. Larios and Amtech had a subject line "New elevator needed for Madison Hotel." These emails were copied to Mr. Dyer, but AHF took no action.

14.     LADBS issued four Orders to Comply dated September 5, 2018, ordering AHF to "restore elevator to public service" by October 5, 2018. AHF then paid Amtech $34,244 to fix the items, including the performance of an overdue Five-Year Load Test. AHF requested an interim

inspection before conducting the Five-Year Load Test (while the elevator remained out of service). That inspection revealed another list of violations that AHF paid Amtech to fix at an estimated cost of $26,553. The additional work further delayed the Five-Year Load Test until January 11, 2019.  The elevator continued to be out of service during this delay.

15.     On January 11, 2019, Amtech advised Mr. Larios that the elevator failed the Five-Year Load Test. STATEWIDE'S Property Supervisor, Eric Gonzalez, advised Mr. Larios that he attended the test and according to DBS, the elevator still needed "quite a bit of work." Amtech recommended that AHF authorize a sheave repair (note: the City inspector called out the sheave as being worn at the interim inspection requested by AHF on November 16, 2018, but AHF chose not to fix it). AHF then authorized that repair at an estimated cost of $24,830.

16.     In February 2019, a Statewide property manager asked Mr. Dyer, "Are there any updates on the elevator at Madison? I have a tenant…who fell trying to go up to her room with her groceries. Please advise."

17.     Amtech also recommended that the sheave (which holds the cable in place as it pulls the elevator up the shaft) be "re-machined" by Titan Machine Corp in Long Island City, New York. This involved removal of the motor and shipment to/from New York. How long the elevator was out is somewhat unclear, but on March 1, 2019, Mr. Larios wrote to Amtech with the subject line "Madison Hotel in Downtown LA elevator is stuck."

18.     In the body of that email, Mr. Larios apologized for coming across as "desperate." He stated, "the Madison Hotel is a bad situation that may get even more out of hand, because of extended downtime of the elevator." He asked (on a Friday) for the mechanics to come the following Monday. He did not ask for after-hours or rush service. He closed the email by stating "**We have several disabled people that need (the elevator), and the legal results are not pretty**."

19.     An elevator's governor rope serves as an "emergency brake" if the elevator starts falling too fast. When the elevator was re-inspected on March 22, 2019, the LADBS inspector found the governor rope dragging on the floor of the machine room. Amtech then replaced the governor rope which further delayed restoring the elevator to service until at least March 27,

2019. Between that date and November 15, 2019, Amtech was called out to trouble shoot the elevator at least 10 times including to rescue an elderly tenant from entrapment.

20.     On March 28, 2019, Ebo Onwunali, the Madison's former on-Site Property Manager, sent an email to Mr. Larios, stating in part "I am highly concerned about our elderly and disabled tenants and would like to get the elevator back as soon as possible." Mr. Larios responded, "We are all concerned about our tenants Ebo."

21.     On October 10, 2019, Amtech (like Continental before it) proposed to "modernize" the elevator at an estimated cost of $112,162. AHF did not accept, nor did it respond.

22.     On November 11, 2019, Mr. Onwunali sent an email to Mr. Larios and Mr. Dyer stating in part, "I'm following up on the attached Building Work Order for the elevator. We really need this elevator back in some capacity or another…Please advise."

23.     On November 19, 2019, Mr. Onwunali protested AHF's delay in getting the elevator operational. Mr. Onwunali wrote to Mr. Larios and Mr. Dyer, "I hope this elevator is not being politicized because I don't understand why you would provide me with a misleading update to something so dire as to quality of human life."

24.     On or about November 20, 2019, AHF received a bid to remodel the elevator from ThyssenKrupp Elevator Company (TKE). TKE's preliminary estimate "given the extensive history of neglect" was between $590,000-$650,000. That estimate was also passed up the chain of command to Mr. Dyer. AHF did not accept this proposal, did nor any other AHF employee solicit other bids for renovation. To date **-over four years later—**AHF has not initiated the modernization recommended by TKE in 2019.

25.     Only a few weeks later, December 5, 2019, Mr. Larios told TKE that all communications should be sent to Larios because "Ebo is no longer with the company."

26.     On January 29, 2020, LADBS issued a new Notice to Comply requiring that the elevator be immediately returned to service. AHF ignored that notice. LADBS issued a second Order to Comply on February 20, 2020. AHF ignored that notice. LADBS issued a third Order to Comply on March 2, 2020. AHF ignored that notice.

27.     On February 13, 2020, Mr. Juan Larios, Assistant Director of Facilities recommended that AHF accept TKE proposal and start work because "the City LA is sending us warnings to start legal procedure for non-compliance."

28.     On February 27, 2020, Mr. Onwunali sent an email to Mr. Dyer and AHF's President and Founder, Michael Weinstein. The email stated, "Congratulations Guys—You got another vacant unit via death. I hope you can enjoy prison as much as you enjoy letting people die as a means to an end. Well done, bravo. Larry would thank you guys too-but, he cant." An elderly tenant, Larry Montella, had died in his third-floor unit during a time when the elevator was out of service for months.

29.     On March 19, 2020, the LADBS Investigation Section informed AHF, by a letter addressed to Mr. Weinstein, that DBS was initiating a formal investigation of AHF's refusal to restore the elevator to service which could result in fines **and/or imprisonment**. The letter also stated, "You are further advised that each day such a condition exists shall be deemed a new and separate offense and may be charged as such."

30.     Within one week of that letter, Mr. Weinstein himself signed the Amtech proposal (sent the previous October), and Mr. Dyer became personally involved with pulling political levers at AHF's disposal to get the "renovation" started. City records show that AHF made a "deal" with DBS to avoid prosecution if AHF pulled a permit to do the "renovation" immediately. But this work was barely enough to get the elevator running. It was not enough to keep it running reliably and safely.

31.     Even after the work was done by Amtech, the elevator hoistway doors still became stuck on such a regular basis that AHF onsite management keeps, or kept, a crowbar in the office to "unjam" the doors. Even with these makeshift repairs, Amtech has still been out to service the elevator at least 50 times (including at least one other tenant entrapment) since it completed the "renovation."

32.     Based upon the sworn testimony of AHF employees and AHF's own documents, Plaintiffs can establish that the elevator was completely out of service during each of the following times:

- 8/10/2018 – 3/20/19 elevator sealed by order of Mark Dyer, AHF Senior Director of Facilities, then sealed by LADBS order dated 9/5/18 until all violations cleared.

- December 2019 through June of 2020 – based upon testimony of AHF Regional Manager who was the Property Manager at The Madison during that time.

- January 29, 2020, through September 21, 2020, when the City "signed off" on the minimal renovation done by AHF to avoid prosecution.

33. In the calendar years 2021-2023**, the elevator has been out of service more than it has worked and goes out several times each week.** On April 6, 2022, a tenant named Johnny Goodwin was trapped in the elevator. The LA Fire Dept. was called out three times, including one unsuccessful attempt to extricate Mr. Goodwin. Eventually an elevator mechanic had to come out and free Mr. Goodwin. Currently, the elevator continues to go out because of the configuration and the age of the hoistway and car doors.

34. It was out on November 8, 2022, and again on November 19, 2022, while it was being "inspected" by an elevator expert named Steve Greene hired by lawyers for AHF. Amtech has recommended various "patchwork" fixes but the simple reality is what Mr. Larios said back in 2018 – <u>The Madison needs a new elevator</u>.

35. In 2021, 18 disabled tenants, including Plaintiffs here Mr. Linwood and Ms. Davis, brough an action styled *Antsdel v. AHF et al. Los Angeles County Superior Court Case No. 21STCV04049* (the Antisdel Action") seeking injunctive relief and damages for state law violations including disability discrimination and violations of the Fair Housing and Employment Act. As trial approached in early 2023, AHF attempted to "buy off" the plaintiffs with escalating offers starting at $4,650 and going as high as $120,000. But four of the plaintiffs including both plaintiffs herein refused the offer.

36. On January 3, 2023, an elevator expert hired by counsel for Defendant testified under oath that the elevator needed a new drive motor (hoist machine) in order to function safely and reliably.

37. On January 1, 2023, AHF's own reasonable accommodation expert testified under oath that it would be a reasonable accommodation for AHF to install a stair chair lift between the

first and second floor.

38.    The Final Status Conference (FSC) of the Antisdel Action was on January 20, 2023 (the same day the LA Times ran a front-page article on the Antisdel Action, https://www.latimes.com/homeless-housing/story/2023-01-20/ahf-madison-hotel-elevator-lawsuit-story).

39.    The day before the FSC, AHF rushed Amtech to prepare an "emergency" quote to renovate the elevator. That quote is attached hereto as Exhibit A.  Mr. Larios told Amtech, "Our office says no worries on minor details now or timing, the important thing is to show we have a signed proposal…We need the proposal to say (1) the hoist machine will have or come with an auxiliary brake (2) because the auxiliary brake makes the rope griper unnecessary, the rope gripper will be removed."

40.    Upon receiving signed agreement between AHF and Amtech, a copy of an $88,649.29 AHF check made out to Amtech, and believing that adequate repairs would be forthcoming, the last four plaintiffs in the Antisdel Action settled their claims and their case was dismissed.

41.    Since dismissal of the Antisdel Action, AHF has not moved forward with the renovations it commissioned on an "emergency" basis. Instead, the elevator goes out of service regularly for days at a time, as acknowledged by Mr. Larios. According to records obtained from the LADBS and Amtech, AHF took out a permit in May of 2023 but has not submitted any drawings/plans for the City to review or approve.

42.    On or around August 4, 2023, there was another entrapment in the elevator where the Los Angeles Fire Department was forced to cause severe damage to the elevator platform and sill in order to extricate tenants. DBS issued a Preliminary Order to return the elevator to service no later than September 11, 2023. The elevator remained out of service for weeks.

43.    Pre-litigation inquiries from counsel (who was also co-lead counsel in the Antisdel Action) to in-house counsel for AHF have been ignored or not substantively responded to.

44.    On information and belief, LADBS issued a new order to restore elevator service by October 10, 2023. AHF did not comply.

45.     To this day, AHF has not installed a stair chair lift. Upon information and belief, AHF has not even looked into installing a stair chair lift.

### Harms and Losses

46.     Tammy Davis has, among other disabilities, arthritis due to an autoimmune disease. She uses a wheelchair. She lived on the second floor until a neighbor's butane stove explosion caused her apartment walls to crumble.   Now, Ms. Davis resides on the first floor but has to go up the second floor for a shower. When the elevator goes out, she has to leave her wheelchair in the lobby and painfully ascend the stairs. When Ms. Davis goes up and down stairs, she has trouble breathing, her heart starts racing, she suffers physical pain in her knee, and depending on the day, physical pain in her upper arms, and her arms go numb from holding onto the railing.

47.     Plaintiff Edwin Linwood is 72 years old and lives on the third floor. Mr. Linwood acts as "record keeper" and "tenant advocate" for his fellow disabled tenants at the Madison. On more than one occasion, AHF Regional Property Manager, Dominique Eastman, has "suggested" he move out. Mr. Linwood has advanced Chronic Obstructive Pulmonary Disease and pain in his legs. Using stairs makes his heart race and he can barely breathe. His legs cause him extreme pain. Despite his conditions, Mr. Linwood helps other tenants whom Defendants ignore. This important and necessary task requires him to visit tenants on other floors.

48.     AHF has made serval attempts to "buy him off" by hiring him as "consultant" or paying him money to leave but he refuses to go.

### JURISDICTION

49.     This Court has jurisdiction over the claims brought under federal law pursuant to 28 U.S.C. §§ 1331 for violations of 29 U.S.C. § 794.  This Court has jurisdiction over the pendent state law claims brought under California law pursuant to 28 U.S.C. § 1367.

### VENUE

50.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) because the real property which is the subject of this action is located in this District and Plaintiff's causes of action arose in this District.

**FIRST CAUSE OF ACTION:**
**VIOLATION OF THE FAIR HOUSING ACT**
**[42 U.S.C. § 3601 et seq.]**

51.     Plaintiffs re-plead and incorporate by reference, as if fully set forth again herein, the factual allegations contained in the preceding paragraphs.

52.     Based upon the foregoing, Plaintiffs qualify as a "handicapped person" as defined at 42 U.S.C. § 3602 of the Fair Housing Act (FHA). Plaintiffs each have physical disabilities because each Plaintiff's conditions as alleged above affect one or more of the following body systems: neurological, musculoskeletal, respiratory.  Further, Plaintiffs' physical impairments substantially limit major life activities including standing, walking and climbing stairs.  Plaintiffs cannot perform the above-noted major life activities in the manner, speed and duration when compared to the average person.  Moreover, Plaintiffs have a history of or have been diagnosed and/or classified as having a physical impairment.

53.     The Madison Hotel is a "covered multifamily dwelling" having four or more units with one or more elevators. Based upon the foregoing facts, Defendant has violated the protections afforded to Plaintiffs under the FHA by:

    a.  Making their rental dwelling unavailable to tenants with disabilities by denying disabled access to upper floor apartments and bathing facilities;

    b.  Discriminating against disabled tenants in the provision of services and facilities at their rental dwelling;

    c.  Failing and refusing to grant Plaintiff's requests for reasonable accommodations in rules, policies, practices, or services when necessary to afford Plaintiff an equal opportunity to use and enjoy the dwelling;

    d.  Failing to engage in an interactive process, if AHF believes Plaintiff's requests were not reasonable;

    e.  Failing and refusing to make the Madison Hotel readily accessible to and useable by handicapped persons thus discriminating in the provision of services and amenities based upon disability; and

    f.  Failing and refusing to maintain its features necessary for disabled access

1    including the elevator.

2    54.    As a result of Defendant's discriminatory acts and omissions, Plaintiffs suffered

3    actual harms and losses including but not limited to physical injuries and physical and mental

4    pain, frustration, and emotional distress. These injuries are the result of Defendant's knowing and

5    intentional violation of Plaintiff's rights under federal law.

6    55.    Plaintiffs' injuries and imminent harm are ongoing so long as Defendant does not

7    take the necessary actions to permanently repair the elevator in Plaintiffs' apartment building and

8    is not compelled to properly maintain that elevator, including making any necessary replacements

9    or modernization so that it provides reliable and consistent vertical access to Plaintiffs and other

10   persons with mobility disabilities.

11   56.    Defendant's stubborn refusal to grant reasonable accommodation requests and/or

12   provide disabled tenants with vertical access despite both its ability and obligation to do so

13   justifies an award of treble, punitive and exemplary damages in addition to all other relief sought.

14   57.    Plaintiffs have no adequate remedy at law to compensate them for the ongoing loss

15   of opportunity to enjoy the amenities for which they pay. Plaintiffs therefore seek, in addition to

16   all appropriate actual damages, an order requiring Defendant to modify their policies and

17   practices, to expedite the necessary repairs and/or modernization to the elevator and to install a

18   stair chair between the first and second floor for use by disabled residents. Plaintiffs also seek an

19   order requiring all AHF employees and executives who have any oversight or management of

20   residential rental units to attend annual fair housing discrimination trainings which include the

21   topic of disability discrimination and accommodations and to require that AHF take adequate

22   steps to prevent any such discrimination in the future.

23   WHEREFORE, Plaintiffs requests relief as outlined below.

24

25
## SECOND CAUSE OF ACTION
**VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT**
**[Cal. Gov't Code § 12955 et seq.]**

26

27   58.    Plaintiffs re-plead and incorporate by reference, as if fully set forth again herein,

28   the factual allegations contained in the preceding paragraphs.

59.     The Madison Hotel is a multifamily housing complex consisting of at least three rental apartment dwelling units and one elevator and is thus a "covered multifamily dwelling unit" as defined in Cal. Gov't Code § 12955.1.

60.     Based upon the foregoing, Plaintiffs are each a "person with a disability" as defined in California Government Code sections 12955.3 and 12926.

61.     The California Fair Employment and Housing Act ("FEHA") prohibits Defendant from discriminating against any person on the basis of disability.  Cal. Gov't Code § 12955.

62.     The Madison Hotel is a housing accommodation within the definition of Government Code section 12927 in that it is a building, structure, or portion thereof that is occupied as, or intended for occupancy as, a residence by one or more families.

63.     Defendant has violated the protections against disability discrimination afforded to Plaintiff under FEHA by:

a.   Making their rental dwelling unavailable to tenants with disabilities by denying disabled access to upper floor apartments and bathing facilities;

b.   Discriminating against disabled tenants in the provision of services and facilities at their rental dwelling;

c.   Failing and/or refusing to grant Plaintiff's requests for reasonable accommodations in rules, policies, practices, or services necessary to afford him and other tenants with disabilities equal opportunity to use and enjoy their dwelling;

d.   Failing to engage in an interactive process, if Plaintiff's requests were not reasonable;

e.   Failing and refusing to make the Madison Hotel readily accessible to and useable by handicapped persons thus discriminating in the provision of services and amenities based upon disability; and

f.   Failing to ensure the public and common areas are readily accessible to and usable by persons with disabilities in order to avoid discrimination based upon disability in the provision of services and amenities, and

g.   Failing and refusing to maintain its features necessary for disabled access

including the elevator.

64.     As a result of Defendant's discriminatory acts and omissions, Plaintiffs have suffered actual harms and losses including but not limited to physical injuries and physical and mental pain, frustration, and emotional distress. These injuries are the result of Defendant's knowing and intentional violation of Plaintiffs' rights under California Law.

65.     Plaintiff's injuries and imminent harm are ongoing so long as Defendant does not take the necessary actions to permanently repair the elevator in Plaintiff's apartment building and is not compelled to properly maintain that elevator, including making any necessary replacements and/or modernization so that it provides reliable and consistent vertical access to Plaintiff and other persons with mobility disabilities.

66.     Defendant's stubborn refusal to grant reasonable accommodation requests and/or provide disabled tenants with vertical access despite both its ability and obligation to do so justifies an award of treble, punitive and exemplary damages in addition to all other relief sought.

67.     Plaintiffs have no adequate remedy at law to compensate them for the ongoing loss of opportunity to enjoy the amenities for which they pay. Plaintiffs therefore seek, in addition to all appropriate actual damages, an order requiring Defendant to modify their policies and practices, to expedite the necessary repairs and/or modernization to the elevator to install a stair chair lift between the first and second floor for use by disabled residents. Plaintiffs also seek an order requiring all AHF employees and executives who have any oversight or management of residential rental units to attend annual fair housing discrimination trainings which include the topic of disability discrimination and accommodations and to require that AHF take adequate steps to prevent any such discrimination in the future.

WHEREFORE, Plaintiffs request relief as outlined below.

## THIRD CAUSE OF ACTION
## VIOLATION OF CALIFORNIA UNRUH CIVIL RIGHTS ACT
### [CIVIL CODE § 51 *et. seq.*]

68.     Plaintiffs re-plead and incorporate by reference, as if fully set forth again herein, the factual allegations contained in the preceding paragraphs.

69.     At all times herein mentioned, the Unruh Civil Rights Act, California Civil Code section 51(b), provides, "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

70.     Defendant owns and operates the Madison Hotel as a business establishment within the meaning of the Unruh Act.

71.     Defendant has violated and continues to violate the Unruh Act and intentionally refuses to provide Plaintiffs with "full and equal accommodations, advantages, facilities, privileges and services" at The Madison Hotel by (1) failing and refusing to grant Plaintiff's requests that it properly repair the elevator on Plaintiff's apartment building (2) failing and refusing to provide Plaintiff with alternative means of ingress and egress when the elevator goes out (3) ignoring Plaintiff's requests and suggestions for a permanent repair of the elevator (4) failing and refusing to properly repair and maintain the elevator in Plaintiff's building so that it could provide consistent and reliable vertical transportation to Plaintiffs and other with mobility disabilities thereby excluding tenants (and potential tenants) with disabilities.

72.     Based upon Plaintiffs' repeated requests, the advice of elevator professionals and experts hired by AHF and repeated Orders to Comply from the City of Los Angeles – all of which Defendant continues to ignore -- and P Defendant's continued refusal to spend the money necessary to permanently repair and/or modernize the elevator with full knowledge that Plaintiffs and other tenants with mobility disabilities rely on the elevator for ingress and egress, Plaintiffs are informed and believe that Defendant has intentionally violated the Unruh act by intentionally discriminating based upon disability in the provision of amenities and services at The Madison Hotel.

73.     As a result of Defendant's discriminatory acts and omissions, Plaintiffs have suffered actual harms and losses including but not limited to physical injuries and physical and mental pain, frustration, and emotional distress. These injuries are the result of Defendant's knowing and intentional violation of Plaintiff's rights under California Law.

74.     Plaintiffs' injuries and imminent harm are ongoing so long as Defendant does not take the necessary actions to permanently repair the elevator in at The Madison Hotel and is not compelled to properly maintain that elevator, including making any necessary replacements or modernization so that it provides reliable and consistent vertical access to Plaintiffs and other persons with mobility disabilities.

75.     Defendant's stubborn refusal to grant reasonable accommodation requests and/or provide disabled tenants with vertical access despite both its ability and obligation to do so justifies an award of treble, punitive and exemplary damages in addition to all other relief sought.

76.     Plaintiffs have no adequate remedy at law to compensate them for the ongoing loss of opportunity to enjoy the amenities for which they pay. Plaintiffs therefore seek, in addition to all appropriate actual damages, an order requiring Defendant to modify their policies and practices, to expedite the necessary repairs and/or modernization to the elevator to install a stair chair between the first and second floor for use by disabled residents. Plaintiffs also seek an order requiring all AHF employees and executives who have any oversight or management of residential rental units to attend annual fair housing discrimination trainings which include the topic of disability discrimination and accommodations and to require that AHF take adequate steps to prevent any such discrimination in the future.

WHEREFORE, Plaintiffs request relief as outlined below.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA DISABLED PERSONS ACT**
**[CIVIL CODE § 54 et. seq.]**

77.     Plaintiffs re-plead and incorporate by reference, as if fully set forth again herein, the factual allegations contained in the preceding paragraphs.

78.     The Disabled Persons Act ("DPA") states, "Individuals with disabilities shall be entitled to full and equal access, as other members of the general public, to all housing accommodations offered for rent, lease, or compensation in this state, subject to the conditions and limitations established by law, or state or federal regulation, and applicable alike to all persons."  Cal. Civ. Code. § 54.1(b)(1).

79.    The Madison Hotel is a housing accommodation within the meaning of the DPA. Cal. Civil Code § 54.1(b)(2).

80.    Plaintiffs are each a person with a disability within the meaning of the DPA.

81.    Defendant has violated the DPA, sections 54 and 54.1, by: (1) failing and refusing to grant Plaintiff's requests that it properly repair the elevator on Plaintiff's apartment building; (2) failing and refusing to provide Plaintiff with alternative means of ingress and egress when the elevator goes out; (3) ignoring Plaintiff's requests for a permanent repair of the elevator; (4) failing and refusing to properly repair and maintain the elevator in Plaintiffs' building so that it could provide consistent and reliable vertical transportation to Plaintiff and to others with mobility disabilities.

82.    As a result of Defendant's discriminatory acts and omissions, Plaintiffs have suffered actual harms and losses including but not limited to physical injuries and physical and mental pain, frustration, and emotional distress. These injuries are the result of Defendant's knowing and intentional violation of their rights as a disabled person under State law.

83.    Defendant's stubborn refusal to grant reasonable accommodation requests and/or provide disabled tenants with vertical access despite both its ability and obligation to do so justifies an award of treble, punitive and exemplary damages in addition to all other relief sought.

WHEREFORE, Plaintiff requests relief as outlined below.

## **PRAYER**

Plaintiffs have no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint.  Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendant as alleged herein, unless Plaintiffs are granted the relief they request.

WHEREFORE, Plaintiffs pray for judgment and the following specific relief against Defendant:

1.    Under the First through Third Causes of Action, for an order enjoining Defendant, their agents, officials, employees, and all persons acting in concert with them:

a.  From continuing the unlawful acts, conditions, and practices described in this complaint;

b.  To permanently repair and maintain the elevator, a necessary feature of accessibility, in a safe and useable condition;

c.  To modify its policies and practices to provide alternate, accessible accommodations when the elevator goes out of service;

d.  To install a stair chair lift from the first to the second floor;

e.   To annually train Defendant's employees, executives, and agents in how to accommodate the rights and needs of physically disabled tenants, and

e.  To implement nondiscriminatory protocols, policies, and practices for accommodating persons with mobility disabilities.

2.  For the First through Third Causes of Action, that the Court retain jurisdiction over the Defendants until such time as the Court is satisfied that Defendant's unlawful policies, practices, acts and omissions, as complained of herein no longer occur, and cannot recur;

3.  Plaintiffs do not seek injunctive relief under Civil Code section 55;

4.  For all Causes of Action, an award to Plaintiffs of all appropriate damages, including but not limited to statutory damages, compensatory damages, treble damages and punitive damages in amounts within the jurisdiction of the Court, all according to proof;

5.  For all Causes of Action, award to Plaintiffs all reasonable statutory attorney fees, litigation expenses, and costs of this proceeding as provided by federal and state law;

6.  Grant such other and further relief as this Court may deem just and proper.

Dated:  December 22, 2023                    DERBY, McGUINNESS & GOLDSMITH, LLP


                                             ____/s/ Steven L. Derby_____
                                             By Steven L. Derby
                                             Attorneys for Plaintiff

1

**<u>DEMAND FOR JURY</u>**

2

Plaintiff hereby demands a jury for all claims for which a jury is permitted.

3

4

Dated:  December 22, 2023                    DERBY, McGUINNESS & GOLDSMITH, LLP

5

6                                                               _____*/s/ Steven L. Derby*_____

7                                                               By Steven L. Derby
                                                                Attorneys for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**



# Service and Repair Order

1/19/2023

**CUSTOMER NAME**
Madison Hotel
423 E. 7th Street
Los Angeles, CA 90014

**AMTECH ELEVATOR SERVICES**
3041 ROSWELL ST
LOS ANGELES, CA 90065

**AMTECH CONTACT**
Tim Patton
Phone:
Email:
Tim.Patton@amtechelevator.com

**PROJECT LOCATION**
MADISON HOTEL
423 E 7TH ST
LOS ANGELES, CA 90014

**PROPOSAL NUMBER**
QTE-001571413

We propose to furnish the necessary material and labor on the following units:

| Unit | Customer Designation |
|------|---------------------|
| Y15885 | ELV 1, 0449 |

## SCOPE OF WORK

Material provided shall be installed in accordance with the ASME A17.1 Safety Code for Elevators and Escalators.

**MACHINE REPLACEMENT**
SCOPE:
- Replace existing geared machine with new
- Replace existing governor with new
- Replace hoist and governor ropes with new
- Perform necessary engineering for machine replacement
- Pull required permits with AHJ
- Conduct inspection with AHJ
- Test/adjust/return to service

NOTE: This proposal pricing is provided "sight unseen" to meet the customer's deadline request (<24hrs). Additional costs are likely and will be added thru change orders. Other major costs maybe associated with this work that are outside our scope (machine room modifications/code consultation with AHJ for example).

Additional info:
1. The hoist machine will come with an auxiliary break
2. The auxiliary makes the rope gripper unnecessary, therefor the rope gripper will be removed

The customer will be responsible for paying local inspection fees if applicable.

A representative will contact you to schedule the work. All work will be performed during regular working days and hours of the Elevator Trade unless otherwise specified above.

SERVICE AND REPAIR ORDER

**PRICE**
$177,298.58
One hundred seventy-seven thousand two hundred ninety-eight and 58/100 dollars

This price is based on a one hundred  percent (100%) downpayment in the amount of $177,298.58
Payment terms:
- The base proposal price is contingent upon receiving a downpayment of one hundred  percent (100%) of the base contract amount.
- The downpayment amount is due in full prior to Amtech ordering material and/or mobilizing.
- If you choose the alternative downpayment amount listed below, the corresponding add shall be applied to the base contract amount.

| Downpayment Amount | Price Adjustment Percentage | Authorization (Initial) |
|---|---|---|
| 50% | +10% | |

In the event 100% of the contract price is not paid up front, we must be paid the remaining balance no later than the completion of work. Final invoice will be submitted once work is scheduled.

This proposal, including the provisions printed on the pages following, shall be a binding contract between you, or the party identified below for whom you are authorized to contract (collectively referred to herein as "you"), and us when accepted by you through execution of this proposal by you and approved by our authorized representative; or by your authorizing us to perform work for the project and our commencing such work.

**SUGGESTED BY:** JAVIE CERVANTES
**TITLE:** Mechanic

Accepted in Duplicate

| Madison Hotel | Amtech Elevator Services |
|---|---|

Date: 1/20/2023                          Date: _____

Signed:                                  Signed:

Print Name: Mark Dyer                    Print Name: Kasie Lambert

Title: VP of Corporate Real Estate and Housing    Title: General Manager, Amtech

Email: christina.comnenoi@ahf.org        Email: Kasie.Lambert@amtechelevator.com

Company Name: Madison Hotel

☑ Principal, Owner or Authorized Representative of Principal or Owner

☐ Agent _____
(Name of Principal or Owner)

SERVICE AND REPAIR ORDER

**SERVICE AND REPAIR ORDER**

## TERMS AND CONDITIONS

1. This quotation is subject to change or withdrawal by us prior to acceptance by you.

2. The work shall be performed for the agreed price plus any applicable sales, excise or similar taxes as required by law. In addition to the agreed price, you shall pay to us any future applicable tax imposed on us, our suppliers or you in connection with the performance of the work described.

3. Payments shall be made as follows: A down payment of One Hundred  percent (100.0%) of the price shall be paid by you upon your signing of this document. Full payment shall be made on completion if the work is completed within a thirty days period. If the work is not completed within a thirty day period, monthly progress payments shall be made based on the value of any equipment ready or delivered. We reserve the right to discontinue our work at any time until payments shall have been made as agreed and we have assurance satisfactory to us that subsequent payments will be made when due. Payments not received within thirty (30) days of the date of invoice shall be subject to interest accrued at the rate of eighteen percent (18%) per annum or at the maximum rate allowed by applicable law, whichever is less. We shall also be entitled to reimbursement from you of the expenses, including attorney's fees, incurred in collecting any overdue payments.

4. Our performance is conditioned upon your securing any required governmental approvals for the installation of any equipment provided hereunder and your providing our workmen with a safe place in which to work. Additionally, you agree to notify us if you are aware or become aware prior to the completion of the work of the existence of asbestos or other hazardous material in any elevator hoistway, machine room, hallway or other place in the building where Amtech personnel are or may be required to perform their work. In the event it should become necessary to abate, encapsulate or remove asbestos or other hazardous materials from the building, you agree to be responsible for such abatement, encapsulation or removal, and in such event Amtech shall be entitled to delay its work until it is determined to our satisfaction that no hazard exists and compensation for delays encountered if such delay is more than sixty (60) days. In any event, we reserve the right to discontinue our work in the building whenever in our opinion this provision is being violated.

5. Unless otherwise agreed in writing, it is understood that the work shall be performed during our regular working hours of our regular working days. If overtime work is mutually agreed upon and performed, an additional charge therefore, at our usual rates for such work, shall be added to the contract price. The performance of our work hereunder is conditioned on your performing the preparatory work and supplying the necessary data specified on the front of this proposal or in the attached specification, if any. Should we be required to make an unscheduled return to your site to begin or complete the work due to your request, acts or omissions, then such return visits shall be subject to additional charges at our then current labor rates.

6. Title to any material to be furnished hereunder shall pass to you when final payment for such material is received. In addition, we shall retain a security interest in all material furnished hereunder and not paid for in full. You agree that a copy of this Agreement may be used as a financing statement for the purpose of placing upon public record our interest in any material furnished hereunder, and you agree to execute a UCC -1 form or any other document reasonably requested by us for that purpose.

7. Except insofar as your equipment may be covered by a Amtech maintenance or service contract, it is agreed that we will make no examination of your equipment other than that necessary to do the work described in this contract and assume no responsibility for any part of your equipment except that upon which work has been done under this contract.

8. Amtech shall not be liable for any loss, damage or delay due to any cause beyond our reasonable control including, but not limited to, acts of government, strikes, lockouts, other labor disputes, fire, explosion, theft, floods, water damage, weather damage, extreme weather, traffic conditions, epidemic, pandemic, quarantine (including Covid-19), sabotage, cyber security, national emergency, act of terrorism, earthquake, riot, civil commotion, war or insurrection, vandalism, misuse, abuse, mischief, or acts of God or nature.

9. We warrant that all services furnished will be performed in a workmanlike manner. We also warrant that any equipment provided hereunder shall be free from defects in workmanship and material. Our sole responsibility under this warranty shall be at our option to correct any defective services and to either repair or replace any component of the equipment found to be defective in workmanship or material provided that written notice of such defects shall have been given to us by you within ninety (90) days after completion of the work or such longer period as may be indicated on the front of this form. All defective parts that are removed and replaced by us shall become our property. We do not agree under this warranty to bear the cost of repairs or replacements due to vandalism, abuse, misuse, neglect, normal wear and tear, modifications not performed by us, improper or insufficient maintenance by others, or any causes beyond our control. We shall conduct, at our own expense, the entire defense of any claim, suit or action alleging that, without further combination, the use by you of any equipment provided hereunder directly infringes any patent, but only on the conditions that (a) we receive prompt written notice of such claim, suit or action and full opportunity and authority to assume the sole defense thereof, including settlement and appeals, and all information available to you for such defense; (b) said equipment is made according to a specification or design furnished by us; and (c) the claim, suit or action is brought against you. Provided all of the foregoing conditions have been met, we shall, at our own expense, either settle said claim, suit or action or shall pay all damages excluding consequential damages and costs awarded by the court therein and, if the use or resale of such equipment is finally enjoined, we shall, at our option, (i) procure for you the right to use the equipment, (ii) replace the equipment with equivalent noninfringing equipment, (iii) modify the equipment so it becomes noninfringing but equivalent, or (iv) remove the equipment and refund the purchase price (if any) less a reasonable allowance for use, damage and obsolescence.

THE EXPRESS WARRANTIES SET FORTH HEREIN ARE THE EXCLUSIVE WARRANTIES GIVEN; WE MAKE NO OTHER WARRANTIES EXPRESS OR IMPLIED, AND SPECIFICALLY MAKE NO WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE; AND THE EXPRESS WARRANTIES SET FORTH IN THIS ARTICLE ARE IN LIEU OF ANY SUCH WARRANTIES AND ANY OTHER OBLIGATION OR LIABILITY ON OUR PART.

10. Under no circumstances shall either party be liable for special, indirect, liquidated, or consequential damages in contract, tort, including negligence, warranty or otherwise, notwithstanding any indemnity provision to the contrary. Notwithstanding any provision in any contract document to the contrary, our acceptance is conditioned on being allowed additional time for the performance of the Work due to delays beyond our reasonable control. Your remedies set forth herein are exclusive and our liability with respect to any contract, or anything done in connection therewith such as performance or breach thereof, or from

the manufacture, sale, delivery, installation, repair or use of any equipment furnished under this contract, whether in contract, in tort (including negligence), in warranty or otherwise, shall not exceed the price for the equipment or services rendered.

11. To the fullest extent permitted by law, you agree to hold us harmless, and defend us and indemnify us against any claim or suit for personal injury or property damage arising out of this contract unless such damage or injury arises from our sole negligence.

12. It is agreed that after completion of our work, you shall be responsible for ensuring that the operation of any equipment being furnished hereunder is periodically inspected. The interval between such inspections shall not be longer than what may be required by the applicable governing safety code.

13. In furtherance of OSHA's directive contained in 29 C.F.R. § 1910.147(f)(2)(i), which requires that a service provider (an "outside employer") and its customer (an "on-site employer") must inform each other of their respective lock out/tag out ("LOTO") procedures whenever outside servicing personnel are to be engaged in control of hazardous energy activities on the customer's site, Amtech incorporates by reference its mechanical LOTO procedures and its electrical LOTO procedures. These procedures can be obtained at www.amtechelevator.com. Customer agrees that is will disseminate these procedures throughout its organization to the appropriate personnel who interact with Amtech personnel while Amtech personnel are working on site at Customer's facility.This Agreement constitutes the entire understanding between the parties regarding the subject matter hereof and may not be modified by any terms on your order form or any other document and supersedes any prior written or oral communication relating to the same subject. Any amendment or modifications to this Agreement shall not be binding upon either party unless agreed to in writing by an authorized representative of each party.

14. This Contract will be deemed voidable, even after execution, if it is determined by Amtech that performance of the services and/or engagement in the contractual relationship/transaction will violate, or is otherwise restricted by, any and all laws, regulations and/or orders, including sanctions laws, that are applicable to Amtech or otherwise apply to Amtech operations.

15. By accepting delivery of parts incorporating software, you agree that the transaction is not a sale of such software but merely a license to use such software solely for operating the unit(s) for which the part was provided, not to copy or let others copy such software for any purpose whatsoever, to keep such software in confidence as a trade secret, and not to transfer possession of such part to others except as a part of a transfer of ownership of the equipment in which such part is installed, provided that you inform us in writing about such ownership transfer and the transferee agrees in writing to abide by the above license terms prior to any such transfer.

**SERVICE AND REPAIR ORDER**